## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | :     **Chapter 11** |
| **LAWRENCE SCHIFF SILK MILLS, INC.** | : |
|  | :     **Bankruptcy No. 16-12396** |
| Debtor. | : |

### DECLARATION OF ROBERT LORING, JR. IN SUPPORT OF (1) MOTION FOR AN ORDER (A) AUTHORIZING DEBTOR TO PAY CERTAIN PRE-RELIEF DATE (I) WAGES, SALARIES, BONUSES, AND OTHER COMPENSATION, AND (II) REIMBURSABLE EMPLOYEE EXPENSES, AND; (B) GRANTING RELATED RELIEF AND (2) MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1112(b) APPOINTING A CHAPTER 11 TRUSTEE OR, ALTERNATIVELY, CONVERTING CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

I, Robert Loring, Jr., hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of Lawrence Schiff Silk Mills, Inc. (the "Debtor"), a debtor and debtor-in-possession in the above captioned chapter 11 case.  In this capacity, I am generally familiar with Debtor's day to day operations, businesses and financial affairs, and books and records

2.      On April 5, 2016 (the "Petition Date"), Pyramid Realty Group, LP ("Pyramid"), Aero Energy and Grant Industries, Inc. (collectively, the "Petitioning Creditors") filed an involuntary petition against Debtor under Chapter 11 of the Bankruptcy Code.  Debtor remains in possession of its assets.

3.      On April 22, 2016, (the "Relief Date"), upon agreement between Debtor and the Petitioning Creditors, the Court entered a *Consent Order for Relief in Involuntary Chapter 11 Case* [Docket No. 7] (the "Consent Order").  The Consent Order granted relief to Debtor under Chapter 11 of the Bankruptcy Code as of the Relief Date.

4.      On April 22, 2016, Debtor filed its: (1) *Motion For an Order (A) Authorizing Debtor to Pay Certain Pre-Relief Date (I) Wages, Salaries, Bonuses, and Other Compensation, and (II) Reimbursable Employee Expenses, and; (B) Granting Related Relief* (the "Wage Motion"); and (2) *Motion For an Order Pursuant to 11 U.S.C. § 1112(b) Appointing a Chapter 11 Trustee or, Alternatively, Converting Case to a Case Under Chapter 7 of the Bankruptcy Code* (the "Trustee Motion" and together with the Wage Motion, collectively, the "Motions").

5.      The Motions seek, on one hand, to allow Debtor to make payments on account of pre-petition wages and wage equivalents to its Former Employees and Independent Contractors (as each term is defined below) and, on the other hand, allow for a Trustee to obtain control of Debtor's assets and business, or alternatively, convert Debtor's Chapter 11 case to a case under Chapter 7 for the orderly liquidation of Debtor's business and assets, thereby preserving and maximizing the value of Debtor's estate.

6.      I am familiar with the contents of each Motion and I believe that the relief sought therein is both necessary under the circumstances, and best serves Debtor's estate and creditors' interests.  Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtor's management and Debtor's advisors.  I am authorized to submit this Declaration on behalf of Debtor, and, if called upon to testify, I could and would testify competently to facts set forth herein.

7.      Part I of this Declaration describes Debtor's business, its capital and corporate structure and the events leading up to the Petition Date.  Part II sets forth the relevant facts in support of each of the Motions.[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant Motion.

147748.01600/102147915v.3

## Part I

## BACKGROUND

8.    Founded in 1918 and headquartered in Quakertown, PA, Debtor's primary

business was the manufacturing of ribbons, bows, ties, straps, webbing and over 500 additional

woven, fabricated materials for more than 1,000 customers worldwide.  LSSM served the Global

Industrial, Apparel, Military, Medical, Packaging and Hospitality markets.

### *Debtor's Formation and Capital Structure*

9.    On February 8, 2012, Debtor purchased the assets and assumed the liabilities of

each of Lawrence Schiff Silk Mills, Inc. (n/k/a RJLS Enterprises, Inc.) ("RJLS"), LSSM Sales,

Inc. and Richnan Corporation (collectively, the "Predecessor Entities").  Each of the Predecessor

Entities are/were controlled by Richard J. Schiff.  Mr. Schiff is also the principal of Pyramid, the

largest of the three Petitioning Creditors.  Mr. Schiff is also a minority holder of Debtor's equity.

10.    Pursuant to that certain Master Purchase and Sale Agreement between Accord

Financial, Inc., as factor ("Accord") and Debtor, as seller, dated as of February 17, 2012, Debtor

sold and conveyed to Accord all of Debtor's rights in certain accounts receivable arising in the

ordinary course of Debtor's business (the "Factored Accounts").

11.    In exchange for the Factored Accounts, and subject to the Master Purchase and

Sale Agreement, Accord agreed to make certain advances, up to a maximum amount of

$2,500,000, to Debtor under that certain Revolving Note and Financing Agreement by and

between Debtor, as borrower, and Accord, as lender, dated as of February 17, 2012 (together

with the Master Purchase and Sale Agreement, collectively, the "Accord Facility").  As of the

Relief Date, Accord asserts that the principal amount of approximately $180,000 remains

outstanding under the Accord Facility.  I make no admission or acknowledgement regarding the amount of indebtedness owed to Accord and reserve all rights.

12.     As alleged security for Debtor's obligations under the Accord Facility, Debtor and Accord entered into that certain Security Agreement dated February 17, 2012, pursuant to which Debtor allegedly granted Accord security interests in and liens upon substantially all of Debtor's assets.  I make no admission or acknowledgement regarding the validity or enforceability of Accord's alleged liens and/or security interests and reserve all rights.

13.     On or about the Petition Date, Accord informed Debtor that it was unwilling to make further advances under the Accord Facility.

14.     As part of the consideration for the Predecessor Entities, Debtor made that certain Secured Convertible Subordinated Promissory Note dated February 17, 2012 in favor of RJLS in the principal amount of $1,800,000.00 (the "Subordinated Facility").  To allegedly secure Debtor's obligations under the Subordinated Facility, Debtor entered into that certain Security Agreement with RJLS dated as of February 17, 2012.  Pursuant to the Security Agreement, RJLS allegedly obtained security interests in and liens upon substantially all of Debtor's assets, except for Debtor's accounts receivable.[2]  I make no admission or acknowledgement regarding the validity or enforceability of RJLS's alleged liens and/or security interests and reserve all rights.

15.     As of January 22, 2016, RJLS asserted approximately $839,627.80 in principal and interest was outstanding under the Subordinated Facility.  I make no admission or acknowledgement regarding the amount of indebtedness owed to RJLS and reserve all rights.

---

[2] Pursuant to that certain Intercreditor Agreement dated February 17, 2012 by and among Debtor, Accord and RJLS, RJLS agreed that the obligations under the Subordinated Facility and any other debts owed by Debtor to RJLS shall be subordinated in all respects to Debtor's obligations arising under the Accord Facility.

147748.01600/102147915v.3

16.     With the consent of the Accord and RJLS, on a post-petition basis, Debtor has collected and applied certain accounts receivable to fund Debtor's final payroll and vacation pay to Debtor's Former Employees and Independent Contractors (as each such term is defined below) as well limited payments to preserve and wind down Debtor's assets.  Both Accord and RJLS have indicated they are unwilling to provide any further accommodations to enable Debtor to operate in Chapter 11, neither in the gap period between the Petition Date and the Relief Date, nor as a debtor in possession.

17.     While Debtor presently lacks liquidity to operate, I believe that the likely value of Debtor's assets exceeds the value of secured claims against Debtor, leaving some chance of recovery for unsecured creditors in this case.

### *Debtor's Marketing Efforts*

18.     Prior to the Petition Date, Debtor had been engaged in a process to sell its business as a going concern.  Those marketing efforts resulted in various expressions of interest from potential buyers.  Prepetition, Debtor entered into non-disclosure agreements with four parties.  Three such parties performed some due diligence into the Debtor's business and assets.  Unfortunately, no potential buyers entered into a binding agreement to purchase Debtor or its assets.

19.     Since the Petition Date, Debtor has entertained potential expressions of interest from several parties.  Debtor has received two requests from parties for post-petition non-disclosure agreements to enable due diligence.  However, to date, no party has made a formal offer to purchase Debtor's business as a going concern.

147748.01600/102147915v.3

### *Debtor's Limited Post-Petition Operations*

20.     Since the Petition Date, Debtor has substantially ceased operating as a going

concern.

21.     As of April 8, 2016, Debtor terminated substantially all of its employees.  Debtor

retained certain key individuals as non-employee independent contractors to preserve Debtor's

assets.  Debtor has no other operations and, absent substantial capital infusion or post-petition

financing, Debtor does not intend to continue as a going concern.

## Part II

## TRUSTEE MOTION

22.     In light of Debtor's capital structure and Debtor's inability to access liquidity at

this critical time with which to continue operations, Debtor's management has decided to wind

down and liquidate its business.

23.     Debtor has been unable to secure financing, both prior to and since the Petition

Date, that would allow management to continue to operate its business in Chapter 11.

24.     At the same time, Pyramid, through its principal Mr. Schiff, has requested that

Debtor's management consent to the appointment of a Chapter 11 Trustee.  Importantly, Mr.

Schiff, through Pyramid's counsel, has expressed interest in providing a limited post-petition

loan to the Chapter 11 Trustee and otherwise accommodating the Chapter 11 Trustee's fees,

statutory commission and administrative expenses, including the payment of ongoing U.S.

Trustee Fees through a carve out (collectively, the "Potential Funding").

25.     I do not believe that Mr. Schiff has formally committed to provide the Potential

Funding.  Instead, I believe that Mr. Schiff, through Pyramid's counsel, has expressed interest in

providing the Potential Funding.

147748.01600/102147915v.3

26.     In light of these facts, Debtor sees no better alternative than to request that a Chapter 11 Trustee be appointed in this Chapter 11 Case.  Debtor believes that Pyramid's request – in light of Mr. Schiff's expression of interest in supporting the Potential Funding – is reasonable and consistent with the best interests of the creditors of Debtor's estate.

27.     Alternatively, should Mr. Schiff elect not to support the Potential Funding, absent some other source of funding of the costs and expenses of administering Debtor's estate in Chapter 11, Debtor's case should be converted to a case under Chapter 7 of the Bankruptcy Code.

## WAGE MOTION

### *Overview of Employees and Related Obligations*

28.     As of the Relief Date, the Debtor's staff consists of approximately 17 independent contractors (the "Independent Contractors"), whom are paid on an hourly basis.  Only 2 of the 17 independent contractors are continuing to regularly provide services to the Debtor as of the date hereof.

29.     Prior to the Relief Date, the Debtor employed approximately 81 full-time employees and 36 part-time employees (collectively, the "Former Employees").  Approximately 21 of the Former Employees were salaried and the remainder of the employees were paid on an hourly basis.

30.     After the Petition Date, on or about April 8, 2016, due to a lack of liquidity, the Debtor terminated its Former Employees (the "Layoffs").  Concurrent with the Layoffs, the Debtor retained certain Former Employees as Independent Contractors.

31.     As of and after the time of the Layoffs, Debtor owed certain Obligations (defined below) to the Former Employees and Independent Contractors for periods worked prior to (and following) the Petition Date.

147748.01600/102147915v.3

32.     Debtor believes that many, if not all, of its Former Employees and Independent Contractors rely exclusively on their compensation, including bonuses, and benefits to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if Debtor is not permitted to pay them their full unpaid compensation, benefits, and reimbursable expenses in the ordinary course of business.

33.     To minimize the personal hardship that the Former Employees and Independent Contractors would suffer if pre-Relief Date Obligations (defined below) are not immediately paid as expected, and to maintain morale and stability in Debtor's remaining workforce during this critical time, the Wage Motion seeks authority to pay and honor, in its sole discretion, certain pre-Relief Date claims for, among other items: wages, salaries, commissions, and other compensation, expense reimbursement, federal and state withholding taxes, and other amounts withheld (including, garnishments, Former Employees' share of insurance premiums, taxes, and retirement savings plan contributions), paid time off, holidays and all other benefits that Debtor has historically provided in the ordinary course of business (collectively, and as more fully described below, the "Obligations") and to pay all costs incident to the foregoing.  In an abundance of caution, the Wage Motion also requests the right to, modify, change, and/or discontinue any of its Obligations in its sole discretion without the need for further Court approval.

34.     I am advised that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides in relevant part, that the Court shall not consider motion to pay prepetition claims within 21 days following the commencement of the case, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, Debtor has narrowly tailored the relief requested in the Wage Motion to pay certain prepetition claims to those

circumstances where the failure to pay such claims would cause immediate and irreparable harm to Debtor and its estate.

### *Obligations*

**(1)     Unpaid Compensation**

35.     In the ordinary course of business, Debtor incurred payroll and related obligations to the Former Employees and Independent Contractors (the "Unpaid Compensation"). Such obligations generally comprise wages, salaries and commissions, but may also include expense reimbursements. Debtor paid its Former Employees and Independent Contractors periodically for wages, salaries and commissions on a weekly basis (each a "Payroll Period"). The Former Employees and Independent Contractors have historically been paid in arrears.

36.     Debtor processed and funded its payroll for its Former Employees and Independent Contractors through a third party processor JetPay HR & Payroll Services (the "Payroll Processor").

37.     As a result, the Payroll Processor also handled deductions and withholding from the Former Employees' paychecks for certain required and/or voluntary items. Deductions include, without limitation, (a) any garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an employee's share of health care benefits and insurance premiums, retirement savings plan contributions, legally ordered deductions, fees and assessments and miscellaneous deductions) (collectively, "Deductions"). Further, Debtor, through the Payroll Processor, is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state, or local taxing authorities (collectively, "Withholdings").

147748.01600/102147915v.3

38.     Because the Former Employees and Independent Contractors were paid in arrears, as of the Relief Date, the Former Employees and Independent Contractors were not paid all of their pre-Relief Date wages and compensation.  Additionally, some Former Employees and/or Independent Contractors may be entitled to compensation because some checks issued to them prior to the Relief Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Relief Date (the "Uncashed Checks").

39.     Importantly, Debtor believes that no Former Employee or Independent Contractor is owed Unpaid Compensation in excess of the $12,850 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code.  Furthermore, Debtor believes that all Independent Contractors meet the criteria for priority treatment under Section 507(a)(4) of the Bankruptcy Code.  As such, payment of the Obligations to these individuals would not violate the statutory priority afforded wages, salaries and other forms of compensation, but would merely accelerate its payment.

40.     Accordingly, the Wage Motion requests authority, but not direction, to fund the Obligations, including applicable Withholdings and Deductions, to utilize the Payroll Processor to process these amounts, and to pay any employer taxes incurred as a result of paying any pre-Relief Date payroll.

**(2)     Honoring Checks for, and Payment of, Reimbursable Expenses**

41.     Prior to the Relief Date and in the ordinary course of its operations, Debtor reimbursed its Former Employees and Independent Contractors for certain ordinary, necessary, and reasonable expenses incurred on behalf of Debtor in the scope of their work (the

Case 16-12396-jkf    Doc 12    Filed 04/22/16    Entered 04/22/16 15:11:14    Desc Main
Document       Page 11 of 13


"Reimbursable Expenses").  Reimbursable Expenses are all incurred on Debtor's behalf and with the understanding that they will be reimbursed.

42.     Accordingly, to avoid harming Former Employees and/or Independent Contractors who may have incurred Reimbursable Expenses, the Wage Motion seeks authority, to be exercised in Debtor's sole discretion, to (a) continue paying Reimbursable Expenses in accordance with pre-Relief Date practices, (b) modify its pre-Relief Date policies relating thereto as it deems appropriate, and (c) pay all Reimbursable Expenses that relate to the pre-Relief Date period that are approved, but unpaid, or that are submitted to Debtor post-Relief Date.

### (3)    Vacation, Sick Leave, Holidays and Paid Time Off

43.     Debtor offered a paid-time-off program to all full time Former Employees (the "PTO Program" or "PTO").

44.     The PTO Program worked on an accrual basis and applied to vacation and sick leave (*i.e.*, there are no separate programs for vacation and/or sick leave).  The amount of PTO a qualifying Former Employee accrued and utilized depended upon the duration and position of the Former Employee's employment with Debtor.

45.     PTO was paid at the qualifying Former Employee's straight-time hourly rate and was not considered "work time" for purposes of the Former Employee's overtime calculation.

46.     Former Employees could not carry over PTO days at the end of the year for use in the following year.  Former Employees are entitled to receive payment for any accrued but unused PTO time.

47.     The PTO Program included payment of PTO on nationally observed holidays on which Debtor closed its business and operations.  Debtor made cash payments in lieu of time off for nationally observed holidays for all full time Former Employees.

-11-

147748.01600/102147915v.3

48.     Accordingly, the Wage Motion seeks authorization, but not direction, for Debtor

to honor and pay any pre-Relief Date amounts related to the PTO Program.


*[Remainder of page intentionally left blank]*

147748.01600/102147915v.3

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 22, 2016

By:
Name: Robert Loring, Jr.,
Title: Chief Executive Officer