**<u>Exhibit "A"</u>**
Agreement

1

FIRST AMENDED ASSET PURCHASE AGREEMENT

DATED AS OF JUNE 29, 2016

BY AND BETWEEN

LAWRENCE SCHIFF SILK MILLS, INC.,

AS SELLER,

AND

BERWICK OFFRAY LLC,

AS PURCHASER

## TABLE OF CONTENTS

**Page**

SECTION 1  INTERPRETATION ..................................................................................2

  1.1  Definitions .......................................................................................................2

SECTION 2  PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS...............6

  2.1  Sale of Acquired Assets...................................................................................6

  2.2  Excluded Assets...............................................................................................6

  2.3  Assumed Liabilities .........................................................................................7

  2.4  Excluded Liabilities .........................................................................................7

  2.5  Purchase Price .................................................................................................7

  2.6  Allocation of Purchase Price ...........................................................................7

  2.7  Sale at Closing Date ........................................................................................8

  2.8  Excluded Assets and Liabilities.......................................................................8

  2.9  Certain Consents..............................................................................................8

SECTION 3  REPRESENTATIONS AND WARRANTIES OF SELLER ......................8

  3.1  Organization and Good Standing .....................................................................8

  3.2  Authorization...................................................................................................8

  3.3  Title to Acquired Assets ..................................................................................9

  3.4  No Broker or Finder ........................................................................................9

  3.5  Disclaimer of Other Representations and Warranties .......................................9

SECTION 4  REPRESENTATIONS AND WARRANTIES OF PURCHASER..............9

  4.1  Organization and Good Standing .....................................................................9

  4.2  Authorization...................................................................................................9

  4.3  No Conflicts....................................................................................................9

  4.4  Consents and Approvals ................................................................................10

  4.5  Litigation ......................................................................................................10

  4.6  "AS IS" TRANSACTION...............................................................................10

  4.7  Disclaimer of Other Representations and Warranties .....................................11

SECTION 5  CERTAIN COVENANTS OF SELLER................................................11

  5.1  Receipt of Property Relating to Acquired Assets............................................11

  5.2  Bankruptcy Action.........................................................................................11

  5.3  Release of Encumbrances...............................................................................11

  5.4  Further Assurances ........................................................................................11

SECTION 6  CERTAIN COVENANTS OF PURCHASER. .......................................12

  6.1  Receipt of Property Relating to Excluded Assets...........................................12

  6.2  Further Assurances ........................................................................................12

SECTION 7  CERTAIN MUTUAL COVENANTS...................................................12

  7.1  Mutual Cooperation.......................................................................................12

  7.2  Approvals and Filings....................................................................................13

  7.3  Public Statements ..........................................................................................13

SECTION 8  CONDITIONS TO SELLER'S OBLIGATIONS ...................................14

  8.1  Representations and Warranties .....................................................................14

  8.2  Compliance with Agreements ........................................................................14

PHIL1 5481438v.7

8.3   Purchaser's Closing Deliveries and Obligations ........................................................ 14
8.4   Auction ...................................................................................................................... 14
8.5   Entry of the Sale Order .............................................................................................. 14
SECTION 9   CONDITIONS TO PURCHASER'S OBLIGATIONS ........................................ 14
9.1   Representations and Warranties ................................................................................. 14
9.2   Compliance with Agreements .................................................................................... 14
9.3   Seller's Closing Deliveries and Obligations .............................................................. 14
9.4   Auction ...................................................................................................................... 14
9.5   Entry of the Sale Order .............................................................................................. 14

SECTION 10   CLOSING; TERMINATION ........................................................................... 15
10.1   The Closing .............................................................................................................. 15
10.2   Termination .............................................................................................................. 16
10.3   Effect of Termination or Breach .............................................................................. 17
SECTION 11   TAXES ............................................................................................................... 17
11.1   Taxes Related to Purchase of Acquired Assets ........................................................ 17
11.2   Cooperation .............................................................................................................. 17
SECTION 12   EXPENSES, ATTORNEYS' FEES AND BROKERS' FEES ............................ 18
12.1   Expenses ................................................................................................................... 18
12.2   Attorneys' Fees; Brokers' Fees; Expenses .............................................................. 18
SECTION 13   MISCELLANEOUS .......................................................................................... 18
13.1   Sale of Acquired Assets Subject to Bankruptcy Court Approval .............................. 18
13.2   Survival of Representations and Warranties ............................................................. 18
13.3   Entirety of Agreement; Amendments and Waivers .................................................. 18
13.4   Assignment .............................................................................................................. 19
13.5   Successors and Assigns; No Third Party Beneficiaries ............................................ 19
13.6   Governing Law; Jurisdiction .................................................................................... 19
13.7   Gender and Number .................................................................................................. 19
13.8   Headings ................................................................................................................... 19
13.9   Construction ............................................................................................................. 19
13.10   Severability ............................................................................................................ 20
13.11   Negotiated Agreement ............................................................................................ 20
13.12   Notices .................................................................................................................... 20
13.13   Counterparts; Facsimile Copies .............................................................................. 21
13.14   Waiver of Jury Trial ............................................................................................... 21
13.15   Time of Essence ..................................................................................................... 21

PHIL1 5481438v.7

## FIRST AMENDED ASSET PURCHASE AGREEMENT

This FIRST AMENDED ASSET PURCHASE AGREEMENT (this "Agreement") is made as of this 29th day of June, 2016, by and between Berwick Offray LLC, a Pennsylvania limited liability company ("Purchaser"), and Lawrence Schiff Silk Mills, Inc., a Pennsylvania corporation ("Seller"), by and through William G. Schwab, in his capacity as Chapter 11 Trustee of Seller.

## W I T N E S S E T H:

WHEREAS, Seller has, from time to time, been engaged in the Business (as defined below); and

WHEREAS, certain creditors of Seller filed involuntary Petitions (as defined below) against Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (each as defined below) before this Agreement was executed; and

WHEREAS, William G. Schwab was appointed as the Chapter 11 Trustee of Seller in the Bankruptcy Case; and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell, transfer and assign to Purchaser, the Acquired Assets (as defined below) in accordance with this Agreement and in accordance with and subject to the Bid Procedures, the Bid Procedures Order and the Sale Order (each as defined below), pursuant to sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, Purchaser and Seller are parties to that certain Asset Purchase Agreement dated as of June 14, 2016 with respect to the sale transaction (the "Original Agreement"); and

WHEREAS, on or about June 15, 2016, the Bankruptcy Court (as defined below) entered the Bid Procedures Order; and

WHEREAS, on June 29, 2016, the Seller conducted an Auction (as defined below) for certain of the Excluded Assets, and Purchaser was determined to have submitted the highest and best offer for these assets; and

WHEREAS, Purchaser and Seller desire to amend the Original Agreement through this Agreement for the purpose of memorializing the amended transaction terms between the parties.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, promises and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound hereby, the parties agree as follows:

## SECTION 1
## INTERPRETATION

1.1 <u>Definitions</u>. Whenever used in this Agreement, unless there is something in the subject matter or context inconsistent therewith, the following words and phrases shall have the respective meanings ascribed to them as follows.

"<u>Acquired Assets</u>" means those assets of Seller identified in <u>Schedule 2.1</u>, which may be modified by Purchaser prior to the Closing solely to remove assets from such schedule.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Allocation</u>" has the meaning set forth in <u>Section 2.6</u>.

"<u>Alternative Transaction</u>" means the Seller entering, or otherwise agreeing to enter, into a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the Acquired Assets to another purchaser or purchasers other than Purchaser.

"<u>Ancillary Agreements</u>" means, together, the Assignment and Assumption Agreement, the Bill of Sale, the Assignment of Patents, Assignment of Trademarks, and Assignment of Copyrights described in <u>Section 2.7</u> and any other assignment agreement.

"<u>Assignment and Assumption Agreement</u>" means that certain assignment and assumption agreement to be executed at Closing with respect to the Acquired Assets.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Auction</u>" means the auction (if any) in connection with the sale of the Acquired Assets, as described in the Bid Procedures Order.

"<u>Avoidance Actions</u>" means all causes of action arising under chapter 5 of the Bankruptcy Code or arising under similar laws of foreign countries.

"<u>Bankruptcy Case</u>" means the chapter 11 case filed by the Seller in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

- 2 -

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

"Bid Procedures" means bid procedures approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bid Procedures Order" means that certain Order (A) Approving Bidding Procedures Relating to Sale of Substantially all of the Debtor's Assets, (B) Approving Stalking Horse Asset Purchase Agreement, (C) Scheduling a hearing to consider the Sale, (D) Approving the form and manner of Notice of Sale by Competitive Sale Process, (E) Establishing Procedures for Noticing and Determining Cure Amounts, and (F) Granting Related Relief entered by the Bankruptcy Court.

"Bill of Sale" means that certain bill of sale to be executed at Closing with respect to the Acquired Assets.

"Break-Up Fee" means an amount equal to five percent (5%) of the Purchase Price, which shall, subject to Bankruptcy Court approval, be afforded the protections, and be paid, as set forth in this Agreement and the Bid Procedures Order.

"Business" means the business of manufacturing and selling ribbon to wholesale and end user customers.

"Business Day" means a day other than a Saturday, Sunday or any other day on which the principal national banks located in the City of Philadelphia, Pennsylvania are not open for business during normal banking hours.

"Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, known or unknown.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to assets or the operation of the Business to which Seller is a party or by which Seller or any assets of Seller are bound. For the avoidance of doubt, the term "Contracts" shall include Contracts relating to real property or personal property.

"Employee" means any employee of Seller as of the Closing Date.

- 3 -

"Encumbrances" means, with respect to any Acquired Asset, any mortgage, deed of trust, pledge, security interest, lien, charge, lease, claim, encumbrance, option, right of first refusal, imperfection of title, covenant, encroachment, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, state of facts or any other restrictions or third party rights.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts.

"Excluded Liabilities" means all of the obligations and liabilities of Seller other than the Assumed Liabilities.

"Expense Reimbursement" means all reasonable costs and expenses of Purchaser incurred in connection with the execution and delivery of this Agreement and the consummation of the Transactions, as approved by the Bankruptcy Court in the Bid Procedures Order.

"Governmental Authority" means any United States federal, state or local government or any foreign government or political subdivision thereof, or any multinational organization or authority or any authority, agency or commission entitled to exercise over the Purchaser any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court, tribunal (or any department, bureau or division thereof), arbitrator or arbitral body.

"Holdback Amount" has the meaning set forth in Section 10.1(b).

"Law" means any federal, state, local or foreign statute, law, code, ordinance, order, rule or regulation or any common law requirement.

"Liability" means any debt, liability, obligation, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"Material Adverse Effect" means, (x) with respect to the Seller, any material adverse effect on the ability of the Seller to perform its obligations under this Agreement and the Ancillary Agreements and consummate the Transactions, and (y) with respect to the Acquired Assets, any material adverse effect on the condition of the Acquired Assets taken as a whole; provided, however, that in determining whether there has been a Material Adverse Effect, any effect to the extent attributable to any of the following shall be disregarded: (i) the occurrence of any event materially adversely affecting the industry in which the Business operates or in which the Acquired Assets are held and not uniquely relating to the Seller, the Business or the Acquired Assets (as applicable); (ii) any change in the general political, economic or business condition, including the commencement, continuation or escalation of war, acts of terrorism, natural disasters or acts of God;

- 4 -

(iii) any change in financial or capital markets, including interest rates or currency exchange rates; (iv) the filing of the Bankruptcy Case; (v) the taking of any action required to be taken by a party under the terms of this Agreement; or (vi) the announcement or existence of this Agreement or the Transactions.

"Original Agreement" has the meaning set forth in the Recitals.

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Permitted Encumbrances" means: (i) those Encumbrances set forth on Schedule 3.3; and (ii) liens for property taxes and assessments not yet due or payable.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Petition" means an involuntary petition for chapter 11 bankruptcy relief.

"Premises" means the facilities operated by the Seller in Quakertown, Pennsylvania and Newville, Pennsylvania.

"Providing Party" has the meaning set forth in Section 7.1(b).

"Purchase Price" means the purchase price payable to Seller for the Acquired Assets provided for in Section 2.5.

"Purchaser" has the meaning set forth in the preamble.

"Requesting Party" has the meaning set forth in Section 7.1(b).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement or a competing transaction.

"Sale Motion" means the motion filed by Seller pursuant to, *inter alia*, sections 363 and 365 of the Bankruptcy Code to obtain the Sale Order.

"Sale Order" means an order of the Bankruptcy Court, authorizing and approving the sale of the Acquired Assets to Purchaser on the terms and conditions set forth herein.

"Seller" has the meaning set forth in the preamble.

"Software" has the meaning set forth in Schedule 2.1.

PHIL1 5481438v.7

"Tax" or "Taxes" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, stamp, withholding, Social Security, unemployment, real property, personal property, alternative or add-on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including any interest, penalties or additions thereto, whether disputed or not, and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability, operation of law (including Treasury Regulation 1.1502-6) or otherwise.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing required to be supplied to a taxing authority in connection with Taxes.

"Termination Date" has the meaning set forth in Section 10.2(b).

"Tiffany" has the meaning set forth in Section 10.1(b).

"Transactions" mean the transactions contemplated by this Agreement, the Ancillary Agreements and all other transactions and agreements contemplated hereby and thereby.

"Transaction Taxes" has the meaning set forth in Section 11.1.

## SECTION 2
## PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS

2.1    Sale of Acquired Assets. Subject to the terms and conditions of this Agreement, at Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in the Acquired Assets.

2.2    Excluded Assets. All assets of Seller that are not Acquired Assets are excluded assets that will not be conveyed to Purchaser under this Agreement (the "Excluded Assets"). The Excluded Assets include, but are not limited to, the following:

(a)    the Excluded Assets detailed on Schedule 2.2;

(b)    Excluded Contracts;

(c)    cash and cash equivalents of Seller;

(d)    all accounts receivable and other receivables of Seller as of the Closing Date;

(e)    the Purchase Price;

(f)    all causes of action, claims for damages, and rights of set off and recoupment, including, but not limited to, Avoidance Actions; and

- 6 -

(g)     all rights, claims and causes of action of Seller relating to this Agreement.

(h)     all corporate minute books, stock transfer books, the corporate seal of Seller and all other corporate books and records relating to Seller's organization and existence.

2.3     Assumed Liabilities. Effective as of the Closing Date, Purchaser shall assume and thereafter in due course pay, fully satisfy, discharge and perform all Liabilities of Seller relating to ownership or use of the Acquired Assets, in each case solely arising after the Closing (collectively, the "Assumed Liabilities").

2.4     Excluded Liabilities. Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Acquired Assets shall be or become liable for or subject to, any Liability of Seller other than Assumed Liabilities, including, but not limited to, the following liabilities, which shall be and remain Liabilities of Seller:

(a)     Liabilities associated with any Excluded Assets;

(b)     Liabilities associated with any and all indebtedness of Seller for borrowed money not included in the Assumed Liabilities;

(c)     Liabilities arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date;

(d)     penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by Seller of any Law;

(e)     Liabilities arising out of or resulting from layoffs or termination of Employees by Seller; and

(f)     all Liabilities for expenses (i) relating to the negotiation and preparation of this Agreement and (ii) relating to the Transactions, in each case to the extent incurred by Seller and including those related to legal counsel, accounting, brokerage and investment advisors fees and disbursements.

2.5     Purchase Price. The aggregate purchase price for the Acquired Assets shall be in an amount equal to US$1,125,000.00, exclusive of and in addition to the assumption of the Assumed Liabilities, if any, and as may be reduced by the Holdback Amount if the Seller fails to satisfy the condition for payment of the Holdback Amount as specified in Section 10.1(b).

2.6     Allocation of Purchase Price. The parties agree to allocate the Purchase Price and Assumed Liabilities among the Acquired Assets in accordance with Section 1060 of the Internal Revenue Code. Purchaser shall prepare and deliver to Seller an allocation schedule setting forth Purchaser's good faith determination of the allocation (the "Allocation") within sixty (60) days of the Closing Date, which Allocation shall be subject to the reasonable comments and approval of Seller, not to be unreasonably withheld, conditioned or delayed. The Allocation shall be prepared in accordance with Section 1060 of the Internal Revenue Code and shall be used by the parties in preparing Form 8594 (Asset Acquisition Statement) for each of Purchaser and Seller

- 7 -

and all Tax Returns of Purchaser and Seller. Purchaser and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) in a manner that is consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith unless required by applicable Law (including as a result of a successful challenge to the allocation in any audits or examinations by any Governmental Authority or any other proceeding). Purchaser and Seller shall cooperate in the filing of any required forms (including Internal Revenue Service Form 8594 under Section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 2.6</u> shall survive the Closing without limitation.

2.7     <u>Sale at Closing Date</u>. The sale, transfer, assignment, conveyance and delivery by Seller of the Acquired Assets to Purchaser and the assumption by Purchaser of the Assumed Liabilities, as provided herein and in the Ancillary Agreements, shall be effected on the Closing Date by (i) the execution and delivery by Seller and Purchaser of the Assignment of Patents, Assignment of Trademarks, and Assignment of Copyrights with respect to Seller' patents, trademarks, and copyrights, respectively, (ii) the execution and delivery by Seller to Purchaser of the Bill of Sale with respect to all of the Acquired Assets, and (iii) the execution and delivery by Seller and Purchaser of the Assignment and Assumption Agreement.

2.8     <u>Excluded Assets and Liabilities</u>. Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

2.9     <u>Certain Consents</u>. If a consent of a third party which is required in order to assign any of the Acquired Assets (or claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of Seller to convey its interest in question to Purchaser, Seller will cooperate with Purchaser and use commercially reasonable efforts in any lawful arrangement to provide that Purchaser shall receive the interests of Seller in the benefits of such Acquired Asset.

## SECTION 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

3.1     <u>Organization and Good Standing</u>. Seller is (a) validly existing and in good standing under the laws of the jurisdiction of its organization and (b) duly qualified to do business and in good standing in each jurisdiction in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification necessary, except for such failures to be so qualified and in good standing which, individually or in the aggregate, could not be reasonably expected to have a Material Adverse Effect.

3.2     <u>Authorization</u>. Subject to entry of the Sale Order, Seller has all requisite power and authority to execute and deliver, and carry out its obligations under, this Agreement and the Ancillary Agreements and consummate the Transactions. Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Seller and, assuming

- 8 -

due authorization, execution and delivery by Purchaser, constitutes or will constitute the legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to entry of the Sale Order.

3.3    Title to Acquired Assets. Except as set forth in Schedule 3.3 hereto, Seller is the owner of the Acquired Assets as of the date hereof. Subject to entry of the Sale Order, Seller has, and at the Closing Purchaser shall receive, good, valid and marketable title to the Acquired Assets, free and clear of any and all Encumbrances except for the Permitted Encumbrances.

3.4    No Broker or Finder. No broker, finder or financial advisor has been engaged by Seller in connection with the Transactions.

3.5    Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Section 3, Seller makes no representation or warranty, statutory, express or implied, at law or in equity, in respect of Seller, the Acquired Assets or the Business, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement. Purchaser hereby acknowledges and agrees that, except to the extent specifically set forth in this Section 3, Purchaser is purchasing the Acquired Assets on an "as-is, where-is" basis and "with all faults."

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

4.1    Organization and Good Standing. Purchaser is a limited liability company duly organized and validly existing and in good standing under the laws of Pennsylvania, and has all requisite power and authority to enter into and carry out its obligations under this Agreement.

4.2    Authorization. Purchaser has all requisite power and authority to execute and deliver and carry out its obligations under this Agreement and the Ancillary Agreements, and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so. Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by Seller, constitutes or will constitute the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws affecting the rights of creditors generally and by general principles of equity (regardless of whether enforcement is considered in a proceeding at law or in equity).

4.3    No Conflicts. The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of Purchaser, (ii) violate any Law to which Purchaser is subject, or (iii) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Purchaser is a party or by which Purchaser is bound.

- 9 -

4.4    Consents and Approvals. Subject to entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transaction do not require the consent or approval of, or filing with, any Governmental Authority.

4.5    Litigation. No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Purchaser's knowledge, has been threatened against Purchaser which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions or would otherwise have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.6    **"AS IS" TRANSACTION**. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN SECTION 3 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, THE BUSINESS OR THE ASSUMED LIABILITIES, AND NO OFFICER, AGENT, REPRESENTATIVE OR EMPLOYEE OF SELLER HAS ANY AUTHORITY, EXPRESS OR IMPLIED, TO MAKE ANY REPRESENTATIONS, WARRANTIES OR AGREEMENTS NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT AND SUBJECT TO THE LIMITED REMEDIES HEREIN PROVIDED. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILTY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. PURCHASER SPECIFICALLY DISCLAIMS (I) THAT IT IS RELYING UPON OR HAS RELIED UPON ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES THAT MAY HAVE BEEN MADE BY ANY PERSON, AND ACKNOWLEDGES AND AGREES THAT SELLER HAS SPECIFICALLY DISCLAIMED AND DO HEREBY SPECIFICALLY DISCLAIM ANY SUCH OTHER REPRESENTATION OR WARRANTY MADE BY ANY PERSON; AND (II) ANY OBLIGATION OR DUTY BY SELLER TO MAKE ANY DISCLOSURES OF FACT NOT REQUIRED TO BE DISCLOSED PURSUANT TO THE SPECIFIC REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 3 OF THIS AGREEMENT. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS OR THE BUSINESS AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3 HEREOF AND AS FURTHER LIMITED BY THE SPECIFICALLY BARGAINED-FOR EXCLUSIVE REMEDIES AS SET FORTH IN SECTION 10 OF THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." AS OF THE DATE HEREOF, PURCHASER IS NOT AWARE OF ANY FACTS, EVENTS OR CIRCUMSTANCES THAT WOULD CAUSE ANY OF THE REPRESENTATIONS OR WARRANTIES OF THE SELLER SET FORTH IN SECTION 3, RESPECTIVELY, TO BE UNTRUE OR INCORRECT IN ANY RESPECT.

- 10 -

4.7     Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Section 4, Purchaser makes no representation or warranty, statutory, express or implied, at law or in equity, in respect of any matter and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement.

**SECTION 5**
**CERTAIN COVENANTS OF SELLER**

5.1     Receipt of Property Relating to Acquired Assets. If, following the Closing, Seller shall receive any money, check, note, draft, instrument, payment or other property as proceeds of the Acquired Assets that arose or came due after the Closing or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, upon receipt thereof, shall promptly notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner specified by Purchaser.

5.2     Bankruptcy Action.

(a)     Seller shall comply in all material respects with all of the obligations of Seller under the Bid Procedures Order (after entry of such Order by the Bankruptcy Court) and the Sale Order (after the entry of such Order by the Bankruptcy Court).

(b)     Seller shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the Transactions. Seller shall serve on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Claim against or interest in any of the Acquired Assets, (ii) the Internal Revenue Service, (iii) all applicable Government Authorities, (iv) all other Persons required by any order of the Bankruptcy Court, and (v) using its commercially reasonable efforts to serve any other Persons that Purchaser reasonably may request, any notice of the Sale Motion, the Sale Hearing, the Bid Procedures Order, the Sale Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules, the Bid Procedures Order, and any applicable local rules of the Bankruptcy Court.

5.3     Release of Encumbrances. Seller's obligation to deliver the Acquired Assets free and clear of any Encumbrances (other than Permitted Encumbrances) shall be limited to Seller's efforts to obtain the Sale Order that provides for the delivery of the Acquired Assets free and clear of any Encumbrances (other than Permitted Encumbrances). If Purchaser desires to have any Encumbrances released and discharged other than by means of the Sale Order, Purchaser, at its sole cost and expense, shall obtain such releases or discharges.

5.4     Further Assurances. Upon the request of Purchaser, Seller shall, at Purchaser's expense, forthwith execute and deliver such documents as Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

- 11 -

## SECTION 6
## CERTAIN COVENANTS OF PURCHASER.

6.1     Receipt of Property Relating to Excluded Assets. If, following the Closing, Purchaser shall receive any money, check, note, draft, instrument, payment or other property as proceeds of the Excluded Assets that arose or came due after the Closing or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Seller and, upon receipt thereof, shall promptly notify Seller in writing of such receipt and shall remit the same (or cause the same to be remitted) to Seller in the manner specified by Seller.

6.2     Further Assurances. Upon the request of Seller, Purchaser shall, at Seller's expense, forthwith execute and deliver such documents as Seller or its counsel may reasonably request to effectuate the purposes of this Agreement.

## SECTION 7
## CERTAIN MUTUAL COVENANTS

7.1     Mutual Cooperation.

(a)     Seller, on one hand, and Purchaser, on the other hand, shall promptly give notice to the other upon becoming aware that any action is pending or threatened by or before any Governmental Authority with respect to the Transactions. Seller, on the one hand, and Purchaser, on the other hand, (i) shall cooperate with each other in connection with the prosecution, investigation or defense of any such action, (ii) shall supply promptly all information requested by the other, by any such Governmental Authority or by any party to any such action that is legally required to be produced, and (iii) shall each use commercially reasonable efforts to cause any such action to be determined as promptly as practicable and in a manner which does not impact adversely on, and is consistent with, the Transactions.

(b)     After the Closing Date, each of Seller and Purchaser shall use commercially reasonable efforts to provide to any other party to this Agreement (the "Requesting Party") such records and information and to make available to the Requesting Party such employees or other personnel, in each case as may be reasonably requested in writing by the Requesting Party, for the purpose of assisting the Requesting Party in responding to governmental inquiries, administering the Bankruptcy Case, making required governmental filings or defending or prosecuting any action or other proceeding involving any Person other than the party providing such information or records or making available such employees or other personnel (the "Providing Party") and in resolving all claims, preparing all tax returns, and handling all matters necessary to administer and close the Bankruptcy Case; provided, however, that no Providing Party shall be required to (i) incur any out-of-pocket expenses, (ii) provide information, records or employees or other personnel under circumstances which the Providing Party believes in its sole reasonable determination may expose it to liability to any Person or may prejudice any commercial, legal or other interest of the Providing Party, or (iii) take any action that in the Providing Party's reasonable determination unreasonably interferes with its business.

- 12 -

7.2    _Approvals and Filings_.  Subject to the terms and conditions of this Agreement, including the possible closing of an Alternative Transaction, each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the Transactions, including using commercially reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, and effecting all necessary registrations and filings. Purchaser shall make or cause to be made all filings and submissions under laws applicable to Purchaser, if any, as may be required for the consummation of the Transactions. Seller shall make or cause to be made all such other filings and submissions under laws applicable to Seller, if any, as may be required for the consummation of the Transactions. Purchaser, on the one hand, and Seller, on the other hand, shall coordinate and cooperate in exchanging such information and reasonable assistance as may be requested by either of them in connection with the filings and submissions contemplated by this Section 7.2. Purchaser, on the one hand, and Seller, on the other hand, shall each promptly provide the other or their respective counsel with copies of all filings made by such party with any Governmental Authority in connection with this Agreement and the Ancillary Agreements and the Transactions.

7.3    _Public Statements_. The parties shall consult with each other prior to issuing any press release or making any public announcement with respect to this Agreement, the Ancillary Agreements, or the Transactions (including the financial terms hereunder and thereunder), and shall not issue any such press release or public announcement prior to such consultation or to which the other party shall reasonably object, except as may be required by law or judicial process, provided that Seller shall be authorized to file a copy of this Agreement with the Bankruptcy Court without any further approval by Purchaser. Purchaser shall not make any statement to, or otherwise communicate (whether orally or in writing) with, any employee or supplier to Seller regarding this Agreement, the Ancillary Agreements or the Transactions except for any statement or communication with respect to which the Seller shall have previously consented in writing.

7.4    _Removal of Acquired Assets From the Premises_.  Purchaser shall exercise reasonable care in the removal of the Acquired Assets from the Premises and shall be solely responsible for the repair of any damages to the Premises caused by the removal of the Acquired Assets therefrom, including, but not limited to, any damages to the Premises caused by the affixation of Acquired Assets to the Premises.

7.5    _Costs of Storage of Acquired Assets on Seller's Premises_.  Provided that the Closing shall have occurred on or before July 31, 2016, Seller shall be responsible for all costs associated with the use of the Premises through and including July 31, 2016. From and after that date, to the extent that Acquired Assets remain stored at the Premises, Purchaser shall be solely responsible, and shall directly pay to the landlord of the Premises and other service vendors, all reasonable costs associated with Purchaser's use of the Premises, including rent, utility costs, insurance costs and security costs; provided, however, that such costs shall be consistent with costs paid by Seller in connection with Seller's use of the Premises.  Purchaser shall provide Seller with at least five (5) business days notice of the date when the Acquired Assets will be completely removed from the Premises and, after the removal is completed, Seller shall be

- 13 -

permitted to reject the leases associated with the Premises and surrender possession of the Premises.

## SECTION 8
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the Transactions are subject to the satisfaction (unless waived in writing by Seller) of each of the following conditions on or prior to the Closing Date:

8.1    Representations and Warranties. The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

8.2    Compliance with Agreements. Purchaser shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

8.3    Purchaser's Closing Deliveries and Obligations. Purchaser shall have delivered all items and satisfied all obligations pursuant to Sections 10.1(b) and 10.1(c).

8.4    Auction. Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

8.5    Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order.

## SECTION 9
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligation of Purchaser to consummate the Transactions is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

9.1    Representations and Warranties. The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

9.2    Compliance with Agreements. Seller shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

9.3    Seller's Closing Deliveries and Obligations. Seller shall have delivered all items and satisfied all obligations pursuant to Section 10.1(a).

9.4    Auction. Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

- 14 -

9.5     Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order.

**SECTION 10**
**CLOSING; TERMINATION**

10.1    The Closing. The Closing of the purchase by Purchaser from Seller and sale by Seller to Purchaser of the Acquired Assets (the "Closing") shall be held no later than five (5) Business Days after the satisfaction or waiver of the conditions set forth in Sections 8 and 9 of this Agreement (excluding those conditions which by their nature are to be satisfied as part of the Closing), or at such other time as the parties hereto may agree (the "Closing Date"). The Closing shall be held at the offices of Klehr Harrison Harvey Branzburg LLP, 1835 Market St., Suite 1400, Philadelphia, PA 19103, or at such other location as the parties hereto may agree. At the Closing, all of the transactions provided for in Section 2 hereof shall be deemed to be consummated on a concurrent and simultaneous basis. Purchaser shall take possession of the Acquired Assets on the Closing Date, and, in the event Purchaser desires to store any or all of the Acquired Assets at Seller's place of business after Closing, Purchaser shall be permitted to do so only upon the mutual written agreement of Seller and Purchaser with respect to the costs associated with the storage of the Acquired Assets, including, but not limited to, rent, or the portion of rent allocable to the space utilized for the storage of Acquired Assets, costs of any security provided for the Acquired Assets and insurance costs.

(a)     Seller's Deliveries at Closing. At the Closing, Seller shall deliver (or cause to be delivered) to Purchaser the following:

(i)      the duly executed Bill of Sale, Assignment and Assumption Agreement and the other Ancillary Agreements;

(ii)     a certified copy of the Sale Order and case docket reflecting that the Sale Order is in effect; and

(iii)    such other documents as Purchaser or its counsel shall reasonably require in order to effect the Transactions.

(b)     Purchaser's Payment of Purchase Price. At the Closing, Purchaser shall deliver (or cause to be delivered) the $1,025,000 of the Purchase Price. The remaining $100,000 of the Purchase Price (the "Holdback Amount") shall be conveyed by Purchaser to Seller within five (5) days after Seller provides Purchaser with the processes associated with the manufacture of ribbon by Seller for Tiffany & Co., Inc. ("Tiffany"), the adequacy of which shall be reasonably determined by Purchaser.

(c)     Purchaser's Deliveries to Seller at Closing. At the Closing, Purchaser shall deliver (or cause to be delivered) to Seller the following:

(i)      the duly executed Bill of Sale, Assignment and Assumption Agreement and the other Ancillary Agreements;

(ii)     certified resolutions of the governing body of Purchaser approving and authorizing the Transactions;

- 15 -

(iii)    a certificate, executed by a duly authorized officer of Purchaser, to the effect that all conditions to Closing set forth in Section 8.1 and Section 8.2 have been satisfied; and

(iv)    such other documents as Seller or its counsel shall reasonably require in order to effect the Transactions.

10.2    Termination. Anything in this Agreement to the contrary notwithstanding, this Agreement and the Transactions may be terminated in any of the following ways at any time before the Closing and in no other manner, subject to the provisions hereof:

(a)    at any time by mutual written consent of Purchaser and Seller;

(b)    by Purchaser, if the Closing shall not have occurred on or before July 31, 2016 (the "Termination Date"); provided, however, that Purchaser may not terminate this Agreement pursuant to this Section 10.2(b) if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser;

(c)    by Seller, if any condition to the obligations of Seller set forth in Section 8 shall have become incapable of fulfillment other than as a result of a material breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(d)    by Purchaser, if any condition to the obligations of Purchaser set forth in Section 9 shall have become incapable of fulfillment other than as a result of a material breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(e)    by Seller, if Purchaser is in breach in any respect of any of its representations made in this Agreement that are qualified by materiality or Material Adverse Effect or in material breach in any respect of any of its representations not so qualified, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) Business Days following receipt of written notice from Seller specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(f)    by Purchaser, if Seller is in breach in any respect of any of its representations made in this Agreement that are qualified by materiality or Material Adverse Effect or in material breach in any respect of any of its representations not so qualified, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) Business Days following receipt of written notice from Purchaser specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(g)    by Seller or Purchaser if there shall be in effect a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall

- 16 -

promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(h) by Seller or Purchaser if the Bankruptcy Court enters an order denying any aspect of the Sale Motion, including refusing to enter or materially modifying the Bid Procedures Order or the Sale Order filed by Seller; or

(i) automatically, if the Seller closes or consummates an Alternative Transaction.

10.3    Effect of Termination or Breach.

(a) No termination of this Agreement pursuant to Section 10.2 shall be effective until written notice thereof is given to the non-terminating party specifying the provision hereof pursuant to which such termination is made.

(b) If this Agreement is terminated pursuant to Section 10.2, this Agreement (other than this Section 10.3 (Effects of Termination or Breach), shall forthwith become null and void, provided, however, that all rights and remedies of Seller and Purchaser for a breach of this Agreement are preserved and shall not be deemed to be affected by a Termination.

(c) If this Agreement is terminated under Section 10.2(i), and provided that no other grounds for Termination under Sections 10.2(a) through (h) exist, Seller shall pay to Purchaser the Break-Up Fee and Expense Reimbursement upon the Closing of the Alternative Transaction under the terms of the Bid Procedures Order.

## SECTION 11
## TAXES

11.1    Taxes Related to Purchase of Acquired Assets. Purchaser shall be responsible for the payment of any state and local sales, transfer, recording, stamp or other similar transfer taxes (collectively "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets and not exempted under the Sale Order, along with any recording and filing fees. Purchaser and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the Transactions. At the Closing, Purchaser shall remit to Seller such properly completed resale exemption certificates and other similar certificates or instruments as are applicable to claim available exemptions from the payment of sales, transfer, use or other similar taxes under applicable law. Purchaser and Seller shall cooperate in preparing such forms and shall execute and deliver such affidavits and forms as are reasonably requested by the other party.

11.2    Cooperation. Purchaser and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer of any governmental or regulatory inquiry relating to tax matters. Purchaser agrees to retain possession of all tax files, books and records delivered to Purchaser by Seller for a period

- 17 -

of at least five years from the Closing Date. If Purchaser determines to destroy or discard any of such files, books or records after the end of such five-year period, Purchaser shall give Seller reasonable notice thereof and shall allow Seller to take possession of such files, books and records at Seller's expense. From and after the Closing Date, Purchaser agrees that it shall provide reasonable access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Seller may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Acquired Assets.

**SECTION 12**
**EXPENSES, ATTORNEYS' FEES AND BROKERS' FEES**

12.1    Expenses. Except as otherwise provided under this Agreement, Seller shall be responsible for all expenses, liabilities and obligations arising out of or relating to the Acquired Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing on or prior to the Closing. Purchaser shall be responsible for all expenses, liabilities and obligations arising out of or relating to the Acquired Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing after the Closing.

12.2    Attorneys' Fees; Brokers' Fees; Expenses. Except as provided herein, each party shall be responsible for the payment of its own attorneys', brokers' and other fees and expenses in connection with the Transactions.

**SECTION 13**
**MISCELLANEOUS**

13.1    Sale of Acquired Assets Subject to Bankruptcy Court Approval. This Agreement, the sale of the Acquired Assets and Seller's ability to perform under this Agreement is conditioned and contingent upon Bankruptcy Court entry of the Sale Order.

13.2    Survival of Representations and Warranties. Until the Closing, all representations and warranties herein shall be operative and in full force and effect. All representations and warranties and covenants contained herein shall terminate and shall not survive the Closing, except the covenants contained in Sections 2, 5.1, 5.3, 6, 7, 10, 11, and 12.

13.3    Entirety of Agreement; Amendments and Waivers. This Agreement (including all schedules and exhibits hereto), together with the Ancillary Agreements and certificates delivered hereunder, state the entire agreement of the parties with respect to the subject matter hereof, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants and agreements which have induced this Agreement. Each of Seller and Purchaser otherwise makes no other representations or warranties including any implied representations or warranties. Each party agrees that in dealing with third parties no contrary representations shall be made. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party hereto of a

- 18 -

breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

13.4    Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties without the prior written consent of the other party except, in the case of Purchaser, to an Affiliate (but only if such Affiliate becomes a party to this Agreement and agrees to be bound by the representations, warranties, covenants and obligations herein and Purchaser guarantees such Affiliate's obligations herein and; provided, however, that no such assignment shall relieve Purchaser of its obligations hereunder). No party shall be relieved of any liability hereunder in respect of any assignment pursuant to this Section 13.4, unless such assignor has received a written release expressly excepting such assignor from any liability that may arise hereunder.

13.5    Successors and Assigns; No Third Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective heirs, personal representatives, legatees, successors and permitted assigns.

13.6    Governing Law; Jurisdiction. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania applicable to contracts made and to be entirely performed therein. In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in the Bankruptcy Court, (iii) waives any claim that such action or proceeding has been brought in an inconvenient forum, and (iv) agrees that service of process or of any other papers upon such party by registered mail at the address to which notices are required to be sent to such party under Section 13.12 shall be deemed good, proper and effective service upon such party.

13.7    Gender and Number. In this Agreement, words importing the singular include the plural and vice versa and words importing a specific gender include all genders.

13.8    Headings. The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

13.9    Construction. In this Agreement (i) words denoting the singular include the plural and vice versa, (ii) "it" or "its" or words denoting any gender include all genders, (iii) the word "including" shall mean "including without limitation," whether or not expressed, (iv) any reference to a statute shall mean the statute and any regulations thereunder in force as of the date of this Agreement or the Closing Date, as applicable, unless otherwise expressly provided, (v) any reference herein to a Section, Exhibit or Schedule refers to a Section of, or Exhibit or

- 19 -

Schedule to, this Agreement, unless otherwise stated, and (vi) when calculating the period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day.

13.10   Severability. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

13.11   Negotiated Agreement. Each of Seller and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

13.12   Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. prevailing Eastern time, when transmitted and receipt is confirmed; (d) if sent by facsimile transmission after 5:00 p.m. prevailing Eastern time and receipt is confirmed, on the following Business Day; and (e) if otherwise actually personally delivered, when delivered, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

| | |
|---|---|
| Purchaser: | Berwick Offray LLC<br>2015 West Front Street<br>Berwick, PA  18603<br>Facsimile: (570) 752-6531 |
| with a copy to: | CSS Industries, Inc.<br>Interchange Corporate Center<br>450 Plymouth Road, Suite 300<br>Plymouth Meeting, PA  19462<br>Attention:  General Counsel<br>Facsimile: (610) 729-3958 |
| Seller: | Lawrence Schiff Silk Mills, Inc.<br>c/o William G. Schwab, Chapter 11 Trustee<br>811 Blakeslee Blvd. Dr. East<br>Lehighton, PA 18235<br>Facsimile: (610) 377-5209 |

PHIL1 5481438v.7

with a copy to:        Richard M. Beck, Esq.
Klehr | Harrison | Harvey | Branzburg LLP
1835 Market Street
Suite 1400
Philadelphia, PA 19103
Facsimile: (215) 568-6603

Any party hereto may change its address for service from time to time by notice given to other parties hereto in accordance with the foregoing.

13.13   Counterparts; Facsimile Copies. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signed facsimile copies of this Agreement shall legally bind the parties to the same extent as original documents.

13.14   Waiver of Jury Trial.   THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).   EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.14.

13.15   Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, times is of the essence.

**[Remainder of Page Intentionally Left Blank]**

- 21 -

**IN WITNESS WHEREOF,** the parties hereto have duly executed and delivered this Agreement as of the date first above written.

**PURCHASER:**

**BERWICK OFFRAY LLC**

By: _____
Name: William G. Schwab
Title: Vice President

**SELLER:**

**LAWRENCE SCHIFF SILK MILLS, INC.**

By: _____
    William G. Schwab, in his capacity as Chapter
    11 Trustee of Lawrence Schiff Silk Mills, Inc.

**IN WITNESS WHEREOF,** the parties hereto have duly executed and delivered this Agreement as of the date first above written.

PURCHASER:

**BERWICK OFFRAY LLC**

By: _____
Name:
Title:

SELLER:

**LAWRENCE SCHIFF SILK MILLS, INC.**

By: _____
William G. Schwab, in his capacity as Chapter 11 Trustee of Lawrence Schiff Silk Mills, Inc.

SCHEDULE 2.1

Acquired Assets

- All inventory at Closing, including, without limitation, finished goods, greige inventory and raw materials.
- All Seller intellectual property, including, without limitation, all dying, finishing and weaving formulations, documentation and processes, including for the Tiffany business; all equipment plans, drawings, schematics and similar documentation; all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof; all trademarks, service marks, trade dress, logos, trade names, and corporate names; all copyrightable works, all copyright rights, and all applications, registrations and renewals in connection therewith; all computer software (including object and executable code, scripts, source code, data, databases, and related documentation, including but not limited to installation and operation manuals) (collectively, "Software"); all trade secrets; all Internet websites, including domain name registrations and content and Software; all other proprietary rights; all telephone and facsimile numbers; all customers lists, names, email addresses and sales history relating thereto; all rights to recover all past, present and future infringement of any of the foregoing; and all copies and tangible embodiments thereof (in whatever form or medium).
- All assets relating to the Tiffany business, including, without limitation, all inventory and all equipment identified below.
- All Taiho screen presses, all transfer printing equipment, all hotstamp equipment, all needle looms, all blocking/spooling equipment, all sewing and merrowing machines, all compacting equipment, all beams, and all over the road vehicles.

## NEWVILLE FACILITY

- All finishing and blocking equipment, including shuttle looms and support equipment, including but not limited to slashing equipment, warping equipment, quillers, spoolers and all associated spare parts.

## THERMCO DYEING FACILITY

- All dyeing equipment.
- All skein blockers and parting risers.
- All roll-up equipment.
- All finishing equipment associated with shuttleloom production.
- General intangibles and intellectual property associated with the foregoing assets, including "Hug Snug" and "Rattail" trademarks on a worldwide basis.
- All contents of maintenance room.

SCHEDULE 2.2

Excluded Assets

- all boilers
- all compressors
- all shop equipment
- all warehouse racking
- certain warehouse material handling equipment
- all office furniture

SCHEDULE 3.3

Permitted Encumbrances

None.